**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| AMERICAN BIRD CONSERVANCY,<br>4301 Connecticut Ave., N.W.,<br>Washington, D.C. 20008; and<br><br>BLACK SWAMP BIRD OBSERVATORY,<br>13551 W. State Route 2,<br>Oak Harbor, Ohio 43449,<br><br>*Plaintiffs*,<br><br>v.<br><br>LISA S. DISBROW, Acting Secretary of the U.S. Air Force;<br><br>COLONEL ANDY STEPHAN, Ohio Air National Guard;<br><br>JIM KURTH, Acting Director, U.S. Fish and Wildlife Service; and<br><br>RYAN ZINKE, Secretary of the U.S. Department of the Interior,<br><br>*Defendants*. | ) | **Civ. No. ____________** |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. Plaintiffs challenge the proposed installation and operation by the Ohio Air National Guard ("ANG"), a reserve component of the United States Air Force, of a wind turbine at Camp Perry, a training facility in Port Clinton, Ohio, on the shore of Lake Erie and adjacent to the Ottawa National Wildlife Refuge. ANG is aware that the proposed turbine is sited in a major bird migration corridor, is located in close proximity to numerous bald eagle nests, and is likely to kill species protected under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544.

Indeed, ANG has declared that the *purpose* of building the turbine is to study its impacts on avian (and bat) mortality.

2. ANG has violated, and the operation of the wind turbine will violate, the ESA. The existing violation occurred when ANG constructed the foundation for the wind turbine before completing its ESA-required consultation with the Fish and Wildlife Service ("FWS"), and before FWS had issued its ESA-required Biological Opinion ("BiOp") concerning the operation of the turbine. *See* 16 U.S.C. § 1536(d) (forbidding "irreversible or irretrievable commitment of resources," such as construction, before consultation).

3. The BiOp itself, on which ANG intends to proceed in constructing and operating the turbine, fails to comport with the ESA and its implementing regulations because it analyzes the anticipated "take" by the turbine of protected species in isolation and without regard to the effect of any other take that has previously been authorized by the FWS, and because it fails to take into account a recent FWS radar study showing that vast numbers of birds move through the Camp Perry area within the rotor sweep range of the wind turbine, thus greatly increasing the probability of collisions.

4. Although ANG is aware that the turbine will kill birds – indeed, is building the turbine to study the resulting avian mortality – it has not sought a permit under the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. §§ 703-712, which prohibits the unpermitted killing of migratory birds, and therefore operation of the turbine will violate that Act.

5. Although ANG is aware that the turbine will kill birds, and specifically threatens ESA-listed species and federally protected eagles, ANG has not prepared an environmental impact statement as required under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370h, nor sought a permit under the Bald and Golden Eagle Protection Act

(“BGEPA”), 16 U.S.C. §§ 668-668d. Hence construction and operation of the wind turbine will violate these statutes as well.

**JURISDICTION AND VENUE**

6. This Court has jurisdiction over this action under 28 U.S.C. § 1331 and 16 U.S.C. § 1540(g), and venue is proper in this District under 28 U.S.C. § 1391.

**PARTIES**

7. Plaintiff American Bird Conservancy (“ABC”) is a national non-profit organization whose mission is to conserve native birds and their habitats throughout the Americas. Its principal offices are in Washington, D.C. and The Plains, Virginia. Founded in 1994, ABC works to reduce threats to birds from habitat destruction; collisions with buildings, communication towers, and wind turbines; predation by non-native species such as feral cats; and toxins such as hazardous pesticides and lead. ABC seeks to achieve these objectives through scientific research and analysis; advocating for bird conservation at the local, state, regional, and federal levels; forming bird conservation partnerships; and pressing for regulatory changes to address these threats effectively.

8. ABC’s “Bird-Smart Wind Energy Program” addresses the threats from wind energy development that does not adequately consider potential impacts on birds, especially those deemed “threatened” or “endangered” under the ESA, and important bird habitats. ABC supports the development of wind power and other renewable energy resources but recognizes a vital public interest in ensuring that they do not needlessly place birds at risk. The rapid development of the wind industry and proliferation of massive wind turbines has already posed a serious threat to eagles, other migratory birds, and other wildlife, including species protected by the ESA. This is particularly true in ecologically sensitive locations and other areas where wind

energy projects are likely to kill large numbers of migratory birds or other wildlife, or destroy or otherwise disrupt their habitat. Accordingly, "bird-smart" wind energy is an important part of the renewable energy solution to climate change, and requires careful site selection, effective operational and compensatory mitigation, and ongoing bird mortality monitoring.

9. ABC regularly submits comments during federal regulatory processes applicable to wind energy projects, both with regard to general policies bearing on wind power and bird impacts, and on individual projects and permit decisions that pose excessive threats to birds. ABC submitted extensive comments on ANG's proposal to construct the wind turbine at issue. If allowed to proceed, the project will impair the interests of ABC and its members who observe, study, enjoy, and otherwise derive scientific, recreational, aesthetic and other benefits from birds in the area where the Camp Perry turbines will be built. In addition, construction of the Camp Perry turbines will establish a precedent that significantly increases the risk that other wind power projects, including those currently under consideration, will in fact be constructed in major migratory bird corridors and in locations occupied by ESA-listed species and bald and golden eagles. The expansion of wind power in this area of vital importance to migratory birds impairs the interests of ABC members, ABC officers, and staff who view birds in the vicinity of the proposed turbine for recreational, scientific, aesthetic, and other purposes.

10. Plaintiff Black Swamp Bird Observatory ("BSBO") is a 501(c)(3) nonprofit membership organization focused on promoting conservation through birding located in Ohio approximately 12 miles from ANG's Port Clinton facility, adjacent to Lake Erie and the Ottawa National Wildlife Refuge. It was founded in 1992 by biologists studying bird migration who recognized the need for an organization to help disseminate their research findings. BSBO's long-term research projects have helped to develop a greater understanding of bird

migration and the habitat needs of songbirds, raptors, shorebirds, and rails. BSBO data have been used to assist both private and governmental land owners in better managing their properties for migratory bird species.

11. BSBO's education and outreach programs have received national accolades. Its strong focus on youth education is highlighted by its Wetland Investigation Network ("WIN") program, which offers students grades K-12 a day-long exploration of the entire marsh ecosystem. Its highly-acclaimed Ohio Young Birders Club for youth ages 12-18 encourages and educates young conservation leaders and serves as a model program for many other state-wide youth birding clubs.

12. BSBO also promotes conservation and economic development through birding by hosting The Biggest Week In American Birding – an annual ten-day birding festival coinciding with the peak of songbird migration in early May. The event raises awareness and appreciation for birds and habitat conservation, and also markets the unique migratory area to birders around the world. In 2014, more than 75,000 birders from 45 states and 22 countries visited the area just to watch birds, spending more than 37 million dollars in the area from mid-April to mid-May.

13. If allowed to proceed, the Camp Perry turbine project will impair the interests of BSBO and its members who observe, study, enjoy, and otherwise benefit from birds in the area where the turbine will be built by killing, harassing or otherwise taking birds in this unique migratory area. The project will also harm BSBO and its members by establishing a precedent that will significantly increase the risk that wind power projects, including those currently under consideration, will in fact be constructed in major migratory bird corridors and in locations occupied by ESA-listed species and bald and golden eagles. The construction of the ANG-

proposed turbine, which will kill migratory songbirds, raptors (including bald and golden eagles), and ESA-protected species, will directly impair the interests of BSBO members, BSBO officers, and staff who view birds for recreational, scientific, aesthetic, and other purposes.

14. Defendant Lisa S. Disbrow is the Acting Secretary of the Air Force and is ultimately responsible for the decision to build and operate the turbine, and is being sued in her official capacity.

15. Defendant Colonel Andy Stephan is the ANG officer at Camp Perry principally charged with implementing the construction of the proposed wind turbine and is being sued in his official capacity.

16. Defendant Jim Kurth is the Acting Director of the Fish and Wildlife Service and is being sued in his official capacity.

17. Defendant Kevin Haugrud is the Acting Secretary of the U.S. Department of the Interior and is being sued in his official capacity.

## STATUTORY FRAMEWORK

### Endangered Species Act

18. Congress enacted the ESA in 1973 to protect existing plant and animal species from extinction. The ESA extends federal protections to endangered and threatened species, and declares that they are of "[a]esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people." 16 U.S.C. § 1531(a)(3). The Act reflects "an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978).

19. The ESA further provides that it is "the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and

shall utilize their authorities in furtherance of the purposes of this [Act]." 16 U.S.C. § 1531(c)(1).

20. Section 9 of the ESA makes it unlawful for any person to "take any [endangered or threatened] species within the United States." 16 U.S.C. § 1538(a)(1)(B); *see also* 50 C.F.R. §§ 17.21, 17.31. The Act defines the term "person" to include "any officer, employee, agent, department, or instrumentality of the Federal Government." 16 U.S.C. § 1532(13). Hence, Defendants are "person[s]" covered by the Act.

21. The term "take" includes "every conceivable way" in which a person could harm or kill protected species. S. Rep. No. 307, 93d Cong., 1st Sess. (1973), *reprinted in* 1973 U.S.C.C.A.N. 2989, 2995. The Act defines "take" broadly to mean any actions that "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

22. The FWS has defined "harass" to include "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3.

23. The term "harm" is defined to "include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." *Id*.

24. Federal agencies are required under ESA Section 7(a)(2) to engage in consultation with FWS before authorizing, funding, or engaging in any "action" to "insure" that such actions are "not likely to jeopardize the continued existence" of any listed species or "result in the destruction or adverse modification of [the designated critical] habitat of such species." 16

U.S.C. § 1536(a)(2). A federal agency must consult with FWS if its proposed action "may affect" listed species or designated critical habitat. 50 C.F.R. § 402.14(a).

25. In fulfilling its Section 7 consultation duties, "each agency shall use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); *see also* 50 C.F.R. § 402.14(d).

26. As part of formal Section 7 consultation, the FWS issues a "Biological Opinion," or "BiOp," which "is the document that states the opinion of the Service as to whether or not the Federal action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." *Id*. § 402.02.

27. To "jeopardize the continued existence of" a listed species means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." *Id.*

28. In preparing its BiOp, the FWS must consider the proposed agency action "taken together with cumulative effects," *id*. § 402.14 (g)(4), meaning "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation," *id.* § 402.02.

29. Compliance with the Section 7 consultation process is essential to fulfillment of the Act's substantive requirement that an agency's action must not jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of critical habitat.

30. Section 7(d) of the ESA, "Limitation on Commitment of Resources," provides that, during consultation, the consulting agency "shall not make any irreversible or irretrievable

commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section." 16 U.S.C. § 1536(d).

31. Section 11(g) of the ESA requires that anyone contemplating a suit to enforce the Act provide the prospective defendant with a written notice of violations at least 60 days before a complaint may be filed. *Id.* § 1540(g). Plaintiffs ABC and BSBO gave the Defendants the notice required under Section 11(g) on October 24, 2016 by written letter.

**Migratory Bird Treaty Act**

32. The MBTA was enacted in 1918 to implement the 1916 Convention between the United States and Great Britain (acting for Canada). Later amendments implemented treaties between the United States and Mexico (1936), the United Sates and Japan (1974), and the United States and Russia (1978). The 1972 convention with Japan was entered into "to cooperate in taking measures for the management, protection, and prevention of the extinction of certain birds" because "birds constitute a natural resource of great value for recreational, aesthetic, scientific, and economic purposes." 1972 Convention Preamble, T.I.A.S. No. 7990 (Mar. 4, 1972). Most native bird species in the United States are protected under FWS regulations implementing the MBTA. *See* 50 C.F.R. § 10.13.

33. Section 2 of the MBTA provides that, "[u]nless and except as permitted by regulations . . . it shall be unlawful at any time, by any means or in any manner to pursue, hunt, take, capture, kill, attempt to take, capture or kill, possess, offer for sale, sell, offer to purchase, purchase . . . or export, at any time, or in any manner, any migratory bird, included in the terms of this Convention . . . or any part, nest, or egg of any such bird." 16 U.S.C. § 703(a). FWS's MBTA regulations define "take" to mean to "pursue, hunt, shoot, wound, kill, trap, capture, or

collect, or attempt to pursue, hunt, shoot, wound, kill, capture, or collect." 50 C.F.R. § 10.12.

34. Section 3 provides that the FWS may by regulation permit the "hunting, taking, capture, killing, possession, sale, purchase, shipment, transportation, carriage, or export of any . . . bird, or any part, nest or egg," giving "due regard to the zones of temperature and to the distribution, abundance, economic value, breeding habits, and times of migratory flight." 16 U.S.C. § 704(a).

35. Federal agencies in violation of the MBTA may be sued under the Administrative Procedure Act ("APA"), which authorizes federal courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2); *see also Humane Soc'y of the U.S. v. Glickman*, 217 F.3d 882, 885 (D.C. Cir. 2000).

**Bald and Golden Eagle Protection Act**

36. BGEPA prohibits the "take" of any bald eagle or golden eagle "at any time or in any manner" "without being permitted to do so" by the FWS. 16 U.S.C. §§ 668(a), (b). The statute imposes strict liability, providing civil penalties for any unauthorized take and criminal penalties for unlawful take caused "knowingly, or with wanton disregard." *Id*. "Take" is defined in the statute to include "wound, kill, . . . molest, or disturb," *id*. § 668c, and includes incidental take as well as intentional actions directed at eagles. BGEPA allows the FWS to issue permits authorizing the take or disturbance of bald and golden eagles, but only if such take "is compatible with the preservation" of eagles. *Id*. § 668a.

37. FWS implementing regulations under BGEPA provide for take permits for both individual instances of incidental take as well as permits for take that is recurring from an ongoing activity. *See* 50 C.F.R. § 22.26. Under the regulations, the FWS may issue an eagle take permit so long as the take is: (1) "compatible with the preservation" of eagles; (2) necessary

to protect an interest in a particular locality; (3) associated with but not the purpose of the activity; and (4) the "applicant has applied all appropriate and practicable compensatory mitigation measures . . . to compensate for remaining unavoidable impacts after all appropriate and practicable avoidance and minimization measures have been applied." *Id.*

**National Environmental Policy Act**

38. Congress enacted NEPA in order to "encourage productive and enjoyable harmony between man and his environment" and to "promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321. NEPA's core function is to "help public officials make decisions that are based on understanding of environmental consequences," 40 C.F.R. § 1500.1(c), by requiring federal agencies to take a "hard look" at potential environmental consequences and environmentally enhancing alternatives "as part of the agency's process of deciding whether to pursue a particular agency action," *Balt. Gas and Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 100 (1983).

39. NEPA requires that an Environmental Impact Statement ("EIS") be prepared for every "major Federal action[] significantly impacting the quality of the human environment." 42 U.S.C. § 4332(c). Under NEPA implementing regulations issued by the Council on Environmental Quality ("CEQ"), a federal agency may prepare an Environmental Assessment ("EA") in order to evaluate whether an EIS is required and to "[a]id an agency's compliance with the Act when no [EIS] is necessary." 40 C.F.R. §§ 1501.3, 1508.9.

## FACTUAL BACKGROUND

**ANG's First Proposal For A Wind Power Project**

40. ANG first considered constructing a wind power project at the proposed location in 2007. The FWS vehemently objected in a December 4, 2007 letter, explaining that the

proposed project lies within "approximately 0.6 miles of Lake Erie and within 0.1 miles of Ottawa National Wildlife Refuge," in "an area of documented bird concentration."

41. FWS noted that the turbine's close proximity to the Ottawa National Wildlife Refuge would be extremely harmful to local bird populations because the refuge:

> 'provides critical wetland habitats for a diversity of wildlife, fish and plants. As a major migration corridor, the area is vital to migratory birds including waterfowl, shorebirds, raptors, and songbirds that need rest and food either after crossing Lake Erie on their way south or before they had back north over the water. As much as 70% of the Mississippi flyway's population of black ducks use Lake Erie marshes for migration.' Furthermore, . . . the American Bird Conservancy has identified the refuge as a Globally Important Bird Area . . . . As wind turbines throughout the world are known to cause mortality of a wide variety of bird species, the Service has serious concerns that installation of a wind turbine(s) adjacent to Ottawa NWR property may have significant impacts on birds.

42. The FWS also noted that "Lake Erie serves as a migration barrier for some raptor species, which rely on thermal air drafts originating over land to fly. These raptors instead fly along the shoreline of the lake, and annual surveys . . . have documented more than 10,000 raptors flying through and around the project area each spring."

43. The FWS further noted that "[a]ll of the proposed project area lies within 1 mile of the Lake Erie coast. Birds stopping over during migration would be expected to travel at lower altitudes than migrating birds, and would be more susceptible to turbines than birds in locations that do not provide migration stopover habitat. The sheer number of birds passing through the region during migration, coupled with the proximity of the project to the Lake, indicate a high probability that, if this project moves forward as proposed, mortality of birds due to turbine strikes would occur."

44. The FWS also explained that the project would pose a particular risk to eagles because the "project area lies adjacent to a woodlot that supports a nesting pair of bald eagles";

that "[a]dditionally, two more eagle nests are located within approximately 1.5 miles of the project area, and a total of 9 bald eagle nests exist within a 5 mile radius of the project site"; and that the "marsh region of the western Lake Erie basin, where the proposed project is located, has the highest concentration of bald eagles in the state" and "serve[s] as staging areas for very large populations of immature bald eagles as well." Therefore, the "proposed project location is of serious concern to the Service because multiple studies have documented the death of various species of eagles" and "[w]ith such a large concentration of bald eagles within the greater project area we believe it is likely that eagles will be impacted if the project moves forward as proposed."

45. In commenting on a draft EA for the proposed project, the FWS in June 2010 reiterated its concerns, emphasizing that "this site presents a high risk to migratory birds, and potentially bats, from turbine placement" and warning that it was "highly likely that migratory birds (potentially including state-listed species and the federally protected bald eagle)" will be taken by the project and that this take "would be a violation of the MBTA."

46. The FWS also advised ANG in 2010 that it should prepare a comprehensive EIS which "should address the potential violations of the [MBTA] and [BGEPA] that could result from implementation of the proposed project."

47. ANG issued a Final EA in 2012 (rather than an EIS) which acknowledged that "Camp Perry is located within the vicinity of an Avian Concern Zone and important Bird Areas" and that "[c]ollision impacts to avian and bat populations may result from the birds and bats that hunt, nest, or breed in the general proximity of Camp Perry."

48. In a September 2012 letter to ANG, the FWS repeated many of its earlier objections, expressed concerns about potential impacts on the endangered Kirtland's warbler and

piping plover, and urged ANG to make a "determination of effects under Section 7 of the ESA" for these and several other potentially affected federally-protected species.

49. The FWS strenuously disagreed with the 2012 Final EA's assertion that eagle impacts were unlikely. It noted that there are "60 known bald eagle nests within 10 miles of the proposed project area," the nearest of which is located approximately 0.58 miles northwest of the project area"; that the "[p]resence of nests and breeding areas indicates an important eagle-use area"; that "migration and wintering data indicate the presence of a migration corridor and stopover area for bald eagles along the western basin of Lake Erie, which would include the project area"; that "[t]ake of bald eagles at several wind power facilities in the eastern U.S. and Canada has recently been documented, including take of a bald eagle at a single small turbine"; that "[g]iven the above breeding season and migration/winter season risk analysis, we believe incidental take of bald eagles may be likely over the life of this project"; and that "[w]ithout a [BGEPA] permit, any eagle take resulting from the construction or operation of the turbine would be unlawful and the ANG may be liable."

50. In September 2012, the Ohio Department of Natural Resources, Division of Wildlife stated that the proposed turbine "falls in an area of greatest concern due to proximity to state and federal conservation areas, bald eagle nests, and the shoreline of Lake Erie[,] thus [will cause] potential impacts to migratory birds" and "will likely result in significant mortality."

51. In September 2013, after ANG issued an EA "Addendum" prepared by its hired outside consultant which downplayed the migratory bird and other wildlife impacts, the FWS rejected ANG's assessment that that the take of eagles was unlikely, repeated its concern for potential impacts on Kirtland's warblers and piping plovers, and stated that for the federal

government to site a project in this area "may set a precedent and imply that siting wind turbines in this area is not a concern for birds, when the reality is that it is a concern."

52. In January 2014, Plaintiffs ABC and BSBO sent to ANG a formal notice of violations and intent to bring suit over multiple violations of the ESA, MBTA, BGEPA, and NEPA. In response, the Director of the National Guard Bureau's Office of Installations and Mission Support informed ABC that "the project will not go forward at this time" and that staff would "review and coordinate the Environmental Assessment and all supporting documentation in accordance with [NEPA], as well as compliance with other environmental statutes including the [ESA]."

**ANG's Renewed Proposal**

53. Rather than electing to forego a wind turbine in the midst of a globally important area for birds, ANG is now proceeding with the project. In July 2016, ANG issued a new Draft EA for "Installation and Operation of Wind Turbine at the 200th Red Horse Squadron" (hereinafter "2016 Draft EA"), along with a new Draft Finding of No Significant Impact ("FONSI"). The 2016 Draft EA states that the purpose for the project is to "install and operate a wind turbine *in order to study certain impacts of wind energy*, while at the same time assist Camp Perry ANGS with its move towards generating more of its energy on base through renewable resources." (emphasis added).

54. The "impacts" that ANG will "study" are the deaths of birds and bats killed by the turbine. Thus, the Draft EA states that the principal purpose of the project is to "study the impacts that construction and operation of this wind turbine will have on local Lake Erie natural resources for two years after construction has been completed," which will "include monitoring avian and bat mortality rates" and that would then be "used to make recommendations on wind

turbine operational modifications to reduce potential impacts to bird and bat populations at Camp Perry and perhaps elsewhere." The Draft EA further states that "[a] primary purpose of the project would be to evaluate design and conservation measures associated with the operation of wind turbines near migratory bird routes."

55. In short, the stated purpose of the project is to observe how many birds (and bats) – including numerous federally protected species – the turbine will kill by being placed in a crucial migratory pathway and globally important bird area so that ANG can then "make recommendations."

56. The Draft EA concedes the project is located "near migratory bird routes"; is "adjacent to the Ottawa National Wildlife Refuge (ONWR Darby Unit), which is known for its high diversity of birds"; and that BSBO "has documented over 10,000 raptors each year migrating around and through the Camp Perry area in 2006, 2008, and 2009" and that BSBO in 2014 "recorded 139 species and 21,154 individuals during 46 days of point count surveys" in just one unit of the refuge. Yet the Draft EA incongruously concludes that "[n]o effects to wildlife are anticipated under the Proposed Action."

57. ANG makes no commitment in the Draft EA or Draft FONSI to pursue an MBTA permit for impacts on migratory birds, or to obtaining a BGEPA permit despite conceding that "[b]ald eagle mortality may result as a consequence of collisions with the wind turbine and its rotating blades." *Id.*

58. The Draft FONSI and Draft EA do commit to some mitigation measures, including "curtailing the operation of the wind turbines during dawn and dusk in spring and fall migration periods." However, while asserting that such measures will "greatly reduce the potential impacts on migratory birds," the 2016 Draft EA contains no analysis of how many birds

will be killed during the remaining majority of the year through operation of the turbine in extremely close proximity to a wildlife refuge and other areas that are heavily used by birds year-round. Rather, the Draft EA merely states that the project will allow ANG to "better understand how to reduce potential bird migratory injuries and mortalities," without explaining how that will occur or setting forth even the most rudimentary research methodologies and protocols that ANG intends to use.

59. While asserting that mitigation measures will "reduce" bird mortalities that would otherwise occur, the 2016 Draft FONSI and 2016 Draft EA ignore at least one way in which the project as repackaged will be *worse* for birds (and bats) than the project previously considered. Specifically, the project now under consideration is larger – with a larger wind swept area – than the one previously considered, which necessarily entails greater risk for birds and bats. *Compare* 2012 Final EA at 6 (describing the proposed turbine as "stand[ing] 40 meters (131 feet), with a three-blade rotor with an overall diameter of approximately 41 meters (135 feet)") *with* 2016 Draft EA at 2-1 (describing the turbine now proposed as having a "rotor diameter of 144 feet (44 meters) and a maximum height of approximately 200 feet (40 meters)").

60. Further, the 2016 Draft EA sets forth only two alternatives – build the turbine, or do not build it (the "no action" alternative). It considers no other means of relying on renewable energy for Camp Perry beyond construction of this wind turbine, thus indicating that ANG has already predetermined the outcome of the NEPA process. Predetermination is also evident from the fact, as admitted in the 2016 Draft EA, that the "foundation for the wind turbine . . . has already been constructed."

61. On March 8, 2016, the FWS released its Biological Opinion and Incidental Take Statement for the Proposed Wind Turbine on the Ohio Air National Guard Station, Camp Perry,

Ohio ("the BiOp"). The BiOp finds that there is the "potential that listed birds or bats may be struck by this turbine as they fly through the airspace surrounding the turbine," but concludes that, due to restrictions on turbine operations proposed by ANG, the project is "not likely to jeopardize the continued existence of the rufa red knot, piping plover, or Kirtland's warbler."

62. The BiOp "assumes" that the project will kill one Kirtland's warbler, one piping plover, and one rufa red knot over the life of the projected 25-year life of the project, and finds that this level of take is "unlikely to effect [sic] the distribution or reproductive success, or significantly impact the number of individuals within the population" of these species. The BiOp presents no analysis as to how the agency arrived at this conclusion. Nor does it address whether even a low level of take will impede the *recovery* of ESA-listed species that, by definition, are already facing the prospect of foreseeable extinction in the absence of concerted efforts to bring about their recovery.

63. In 2016, shortly after release of the Camp Perry 2016 Draft EA, the FWS released the results of a 2012 advanced radar study showing that vast numbers of birds and bats move through the Camp Perry area in Spring and Fall each year within five miles of the lake shore and that migrating birds frequently descend at lower altitudes and move within the rotor sweep range of wind turbines, thus greatly increasing the probability of collisions. Although the FWS was certainly aware of the pendency of this study, it issued the BiOp (and ANG released the 2016 Draft EA) without awaiting the publication of the results, and so neither the BiOp nor the 2016 Draft EA consider the import of this study in evaluating the proposed project's impacts on protected species.

64. In August 2016, ABC and BSBO submitted comments to ANG on the 2016 Draft EA, noting that "Camp Perry is a disastrous location for the installation of even a single wind

turbine given its close proximity to the southern shoreline of Lake Erie – one of the most important confluences of neotropical migratory songbirds, bats and raptors moving to and from the boreal forests of Canada to breed."

65. ABC/BSBO gave the Defendants the notice of violations and intent to sue required by Section 11(g) of the ESA on October 24, 2016. Although not required to do so, ABC and BSBO's letter also detailed violations of the MBTA, BGEPA, and NEPA, and offered to meet with Defendants to discuss the issues raised in the letter. ABC/BSBO received no response. Since then both BSBO and ABC have inquired of Defendant Colonel Stephan of ANG's plans to proceed with the turbine project, most recently in an email to the Colonel from ABC on February 1, 2017, but neither BSBO nor ABC has received a response to their inquiries. Accordingly, on information and belief, ANG has made a final decision to proceed with the project without rectifying any of the legal violations identified by ABC/BSBO.

## PLAINTIFFS' CLAIMS FOR RELIEF

### Claim One: Violations of the Endangered Species Act and the APA

66. ANG has violated the ESA by unlawfully undermining the ESA Section 7 consultation with the FWS and by relying on a FWS BiOp that contravenes the ESA and its implementing regulations. The FWS has violated the ESA by producing a BiOp that contravenes the Act and its implementing regulations. Both ANG and the FWS have also violated the APA, 5 U.S.C. § 706, because their actions have been arbitrary and capricious, an abuse of discretion, and contrary to law.

67. Section 7(d) of the ESA, "Limitation on Commitment of Resources," forbids a consulting agency from making "any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or

implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section." 16 U.S.C. § 1536(d) emphasis added).

68. By constructing the base for the wind turbine project before the completion of formal Section 7 consultation, ANG violated Section 7(d) of the ESA, *id.*, and the APA, 5 U.S.C. § 706.

69. ANG's use of taxpayer money to construct the physical base for the turbine is precisely the kind of "irreversible or irretrievable commitment of resources" that Section 7(d) was designed to foreclose during ESA consultation. ANG's evident purpose in constructing the base before obtaining the FWS's BiOp was to steam roll the project so that the FWS would have less incentive to engage in a thorough review of project impacts and alternatives.

70. By preparing a BiOp that analyzes the anticipated "take" by the project of ESA-protected species in isolation and without regard to the effect of any other "take" of the affected species that has previously been authorized by the FWS, and by failing to consider whether the anticipated "take" by the project of ESA-protected species will undermine the recovery of those species, FWS has violated the ESA, 16 U.S.C. § 1536(b), and the APA, 5 U.S.C. § 706.

71. The BiOp contains virtually no analysis to support its summary conclusion that the turbine "is not likely to jeopardize the continued existence of the rufa red knot, piping plover, or Kirtland's warbler." While stating that the "Great Lakes population of piping plovers was estimated to be 126 individuals" and that "[a]t *current* population levels the take of one bird over a 25 year period would represent .79% of the population," (emphasis added), the BiOP sets forth no analysis of how such a small population's present and projected "baseline" condition will be impacted by the death of a plover *in conjunction with* other forms of authorized and/or anticipated take. In particular, the BiOp does not even indicate how many other "takes" from the

same population the FWS has *already* authorized in previously issued BiOps/Incidental Take Statements under Section 7 and/or Incidental Take Permits under Section 10 of the ESA. This information is essential to properly and lawfully characterize the plover's "baseline" condition in the area and to determine whether even one additional authorized death, which may seem small in isolation, may nonetheless have significant additive impacts that must be considered in formal consultation.

72. ESA regulations provide that the FWS must evaluate the "effects of the action and cumulative effects on the listed species or critical habitat." 50 C.F.R. § 402.14(g). The effects of the action include the "direct and indirect effects of an action on the species . . . together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline." *Id*. § 402.02. The "environmental baseline" is defined to include the "present and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process." *Id.*

73. The ESA regulations therefore make clear that an action's impact on a species or population "cannot be determined or analyzed in a vacuum." Here, however, the BiOp makes no mention of the incidental take that has already been authorized by the FWS and that will affect the same populations of piping plovers, Kirtland's warblers, and Rufa red knots that will be harmed by the project. Nor does the BiOp address any of the "State or private actions which are contemporaneous with the consultation" for the Camp Perry wind turbine – such as other wind projects that have been built or are slated for construction on non-federal land and will have impacts on the species that have never been taken into consideration in any consultation.

74. The 2016 Draft EA acknowledges an already operating turbine at the nearby Lake Erie Business Park which, based on the reasoning in the BiOp, is already having an adverse impact on the same ESA-listed bird populations discussed in the BiOp (indeed, *more* of an impact since that turbine is likely not abiding by any of the operational restrictions the BiOp assumes for the Camp Perry project). Yet the BiOp makes no effort to incorporate the adverse current and anticipated effects of that project or any other project into the environmental baseline. In the absence of that analysis, the BiOp does what the ESA regulations forbid: it considers the anticipated take from the Camp Perry turbine in a vacuum, entirely divorced from other incidental take authorized by the FWS in other consultations, as well as that which will likely occur but has never been authorized by the Service. By failing to consider whether the anticipated "take" by the project of ESA-protected species will have cumulative impacts, FWS has violated the ESA regulations, 50 C.F.R. § 402.14 (g)(4), and the APA, 5 U.S.C. § 706.

75. The BiOp contains no analysis of whether even a low level of anticipated take for the affected imperiled species will undermine the *recovery* of the species. Section 7 requires that ANG, in consultation with the FWS, "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered or threatened species." 16 U.S.C. § 1536(a)(2). In turn, the ESA implementing regulations define "jeopardize the continued existence of" to mean to "engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival *and recovery* of a listed species in the wild." 50 C.F.R. § 402.02 (emphasis added). Here, however, the BiOp fails even to address the recovery prospects of the three affected bird species, let alone analyze the extent to which the anticipated take associated with the Camp Perry turbine, in conjunction with other current and prospective impacts on the species' baseline condition, will

forestall or prevent recovery. By failing to consider whether the project, along with cumulative impacts, will undermine the recovery of protected species, FWS has violated the ESA regulations, 50 C.F.R. § 402.02, and the APA, 5 U.S.C. § 706.

76. Under the ESA regulations, re-initiation of formal consultation is required when "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. § 402.16(b). The newly released FWS radar study on the south shore of Lake Erie demonstrates that there is a much greater likelihood of collisions with the proposed Camp Perry turbine than is reflected in either the BiOp or the 2016 Draft EA. Accordingly, ANG and FWS are required, but have failed, to reinitiate consultation so that the study can be taken into consideration in the FWS's analysis of the anticipated level of take and the effect that will have on the species as a whole. 16 U.S.C. § 1536(a)(2) (requiring that "[i]n fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available").

77. ANG, by building the turbine base before the end of Section 7 consultations and by relying on a FWS BiOp that contravens the ESA, and FWS, by preparing a BiOp that contravenes the ESA, have also violated the APA because their actions are "arbitrary, capricious, an abuse of discretion" and "otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and are "without observance of procedure required by law," *id.* § 706(2)(D).

78. Defendants' violations of the ESA and the APA have injured and continue to injure Plaintiffs in the manner described above.

**Claim Two: Violation of the Migratory Bird Treaty Act and the APA**

79. By proceeding with the turbine project without first obtaining, or even making any effort to obtain, an MBTA permit covering the project's anticipated "take" of migratory birds, ANG is violating the MBTA, 16 U.S.C. §§ 703 *et seq.*, and the APA, 5 U.S.C. § 706.

80. Section 2(a) of the MBTA provides that "[u]nless and except as permitted by regulations made as hereinafter provided in this subchapter, it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill . . . any migratory bird . . .included in the conventions . . . ." 16 U.S.C. § 703(a).

81. Section 3(a) of the MBTA provides that, "in order to carry out the purposes of the conventions" the Secretary of the Interior may "determine when, to what extent, if at all, and by what means, it is compatible with the terms of the conventions to allow . . . killing . . . of any such bird . . . and to adopt suitable regulations permitting and governing the same . . . ." 16 U.S.C. § 704(a). Pursuant to that authority, the FWS has adopted regulations that prescribe when permits may be issued, including for "scientific research or educational purposes," 50 C.F.R. § 21.23, or for "special purpose activities related to migratory birds," including where there is a "compelling justification" for such activities. *Id*. § 21.27.

82. The MBTA's prohibition on the unpermitted take of migratory birds applies to federal agencies. Accordingly, where, as here, it is inevitable that operation of a turbine at Camp Perry – immediately adjacent to a national wildlife refuge and in the midst of a globally important location for bird conservation – *will* kill migratory birds protected by the MBTA, ANG is prohibited from proceeding with the project without first obtaining an MBTA permit from the FWS.

83. In contrast to commercial wind power projects – the sole purpose of which is to produce energy while having an "incidental" (if unavoidable) impact on birds – the stated *primary purpose* of the Camp Primary project is to "*study the impacts* that construction and operation of this wind turbine will have on local Lake Erie natural resources for two years after has construction has been completed . . . includ[ing] *monitoring avian and bat mortality rates*." 2016 Draft FONSI at 1 (emphasis added). In addition, an asserted "purpose of the Proposed Action is to provide opportunities for scientific research that could result in new or improved design and conservation measures associated with the operation of wind turbines near migratory bird routes, which is Camp Perry's location." 2016 Draft EA at 2-5. In short, causing bird mortality is not merely an "incidental" result of a project focused on energy production but, rather, the very purpose of the project.

84. ANG is violating the MBTA and the APA by pursuing this project without first applying for and obtaining an MBTA permit from the FWS. The FWS regulations provide that a "scientific collecting permit is required before any person may take, transport, or possess migratory birds, their parts, or eggs for scientific research or educational purposes." 50 C.F.R. § 21.23. No such permit may be issued until and unless the FWS has fully analyzed the impact of the activity, determined that the permit applicant has established an adequate "purpose and justification for granting such a permit," *id.* § 21.23(b)(3), provided other detailed information, *id.*, and attached appropriate "permit conditions" designed to limit the activity's adverse impacts and ensure that the research serves a legitimate purpose related to bird conservation, *id.* § 21.23(c). Such a permit is a legal prerequisite to the Camp Perry wind project proceeding any further.

85. Even if the Camp Perry turbine was intended *solely* to generate energy – such that migratory bird deaths could be considered purely an incidental, if inevitable, byproduct of the project – ANG would still be required to comply with the MBTA's permitting regime. ANG's 2016 Draft EA concedes that the MBTA "[r]equires Federal agencies to obtain permits from USFWS before any 'take' occurs, even when the agency intent is not to kill or injure migratory birds." 2016 Draft EA at 3-2. Thus, regardless of how ANG characterizes the purpose of the proposed turbine project, ANG cannot erect the turbine without first obtaining an MBTA permit.

86. ANG's pursuit of the project without obtaining, or even applying for, a permit under the MBTA violates the APA because it is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, 5 U.S.C. § 706(2)(A), as well as "without observance of procedure required by law," *id.* § 706(2)(D), and also constitutes agency action that has been unlawfully withheld and unreasonably delayed, *id*. § 706(1).

87. Defendants' actions have injured and continue to injure Plaintiffs in the manner described above.

**Claim Three: Violation of the Bald and Golden Eagle Protection Act and the APA**

88. By proceeding with the turbine project without a permit under the BGEPA, ANG is violating the BGEPA, 16 U.S.C. § 668(a), and the APA, 5 U.S.C. § 706.

89. ANG acknowledges that the BGEPA broadly prohibits the "take" of any bald or golden eagle" unless allowed by permit." 2016 Draft EA at 3-2. ANG does not have and has made no commitment to apply for or secure a BGEPA permit.

90. "Take" is broadly defined by the BGEPA and implementing regulations to include "wound," "kill," and "disturb." 16 U.S.C. § 668c; 50 C.F.R. § 22.3. The project's close proximity to multiple eagle territories and nests makes it inevitable that eagles will be "taken"

within the meaning of the Act. Accordingly, the turbine cannot be constructed legally under the BGEPA without a permit.

91. ANG's further construction or operation of the project without *first* applying for and obtaining a BGPA permit will violate that statute.

92. ANG's pursuit of the project without first obtaining, or even applying for, a permit under BGEPA also violates the APA because it is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, 5 U.S.C. § 706(2)(A); is "without observance of procedure required by law," *id*. § 706(2)(D); and also constitutes agency action that has been unlawfully withheld and unreasonably delayed, *id*. § 706(1).

93. Defendants' actions have injured and continue to injure Plaintiffs in the manner described above.

**Claim 4: Violation of the National Environmental Policy Act and the APA**

94. By proceeding with the turbine project without preparing an EIS, or a legally adequate EA, ANG has violated and is violating the NEPA, 42 U.S.C. § 4321 *et seq.*, and the APA, 5 U.S.C. § 706.

95. In evaluating the need for an EIS, ANG must consider both the "context" and "intensity" of the action. 40 C.F.R. § 1508.28.27.

96. As for "context," CEQ regulations provide that "[s]ignificance varies with the setting of the proposed action," so that "in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole." *Id*. § 1508.27(a). Here, however, the Camp Perry turbine is proposed to be built in such a disastrous location that it would have seriously adverse effects *both* in the "locale" and, given the globally important bird area that will be affected, the "world as a whole."

97. As for "intensity," the NEPA regulations set forth a number of factors that must be considered in assessing "significance," any one of which is sufficient to trigger the need for an EIS. *Id.* § 1508.27(b). Here, virtually all of those factors are implicated, including:

> the proposed project's impact on "[u]nique characteristics of the geographic area such as proximity to . . . ecologically critical areas," *id.* § 1508.27(b)(3);
>
> the proposed project's environmental impacts are "highly controversial," *id.* § 1508.27(b)(4), especially given the FWS's repeated objections to the location for a wind project;
>
> the proposed project "involve[s] unique or unknown risks" to federal trust resources, *id.* § 1508.27(b)(5);
>
> a federal entity's determination to build a turbine in such a crucial migratory corridor "may establish a precedent for future actions with significant effect or represents a decision in principle about a future consideration," *id.* § 1508.27(b)(6);
>
> the action is "related to other actions with . . . cumulatively significant impacts," *id.* § 1508.27(b)(7) – including other wind power projects affecting the same populations of birds and bats that will be harmed by the Camp Perry project;
>
> the project may "adversely affect . . . significant . . . cultural, or historical resources," *id.* § 1508.27(b)(8) – particularly the bald eagle, a species that not only has biological importance but also extraordinary cultural and historic significance to citizens of the United States as our national emblem;
>
> the project "may adversely affect an endangered or threatened species," *id.* § 1508.27(b)(9), including the three federally-protected species discussed in the BiOp; and
>
> the "action threatens a violation of Federal . . . requirements imposed for the protection of the environment," *id.* § 1508.27(b)(10) – including the ESA, MBTA, and BGEPA.

98. Preparation of an EIS would enable ANG to take the legally mandated "hard look" at project impacts, as well as reasonable alternatives to putting a wind turbine in one of the worst possible locations in the country for a wind turbine project from the standpoint of wildlife. *See* 40 C.F.R. § 1502.14 (explaining that a consideration of alternatives is the "heart of" an EIS, which must "[r]igorously explore and objectively evaluate all reasonable alternatives").

99. ANG's legally deficient EA considers no alternatives to decreasing Camp Perry's greenhouse gas emissions without risking grave harm to invaluable wildlife resources. *See also id*. § 1500.2 (the NEPA process is designed to "identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment").

100. ANG has also unlawfully undermined the NEPA process by constructing the base of the turbine before even issuing a final EA, let alone an EIS. The central purpose of NEPA is to "integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts." *Id*. § 1501.2. Accordingly, the NEPA regulations require that "[a]gencies *shall not commit resources prejudicing selection of alternatives before making a final decision*," *id*. § 1502.2 (emphasis added), and that a NEPA document "shall be prepared early enough so that it can serve practically as an important contribution to the decisionmaking process *and will not be used to rationalize or justify decisions already made*," *id*. § 1502.5 (emphasis added). Building the base of the turbine before even issuing a draft EA for public comment (and before even completing consultation with the FWS) is a blatant NEPA violation.

101. ANG's pursuit of the project, including by building the base for the turbine, without preparing an EIS or otherwise fully complying with NEPA, violates the APA because it is arbitrary, capricious, an abuse of discretion and not otherwise in accordance with law, 5 U.S.C. § 706(2)(A); is "without observance of procedure required by law," *id.* § 706(2)(D); and also constitutes agency action that has been unlawfully withheld and unreasonably delayed, *id*. § 706(1).

102. Defendant's actions have injured and continue to injure Plaintiffs in the manner described above.

WHEREFORE, Plaintiffs respectfully request that this Court:

1. declare that Defendants have violated the ESA, MBTA, BGEPA, NEPA, and APA;

2. vacate and enjoin Defendants' authorization of the Camp Perry wind turbine project;

3. order Defendant FWS to prepare a new Biological Opinion that considers all relevant factors and is based on the best available science;

4. order Defendants to reinitiate ESA Section 7 consultations to take account of all relevant factors and the best available science;

5. order ANG to obtain permits under the MBTA and BGEPA before further proceeding with the wind turbine project;

6. order ANG to prepare an EIS before further proceeding with the wind turbine project;

7. award Plaintiffs their costs, attorneys' fees, and other disbursements for this action, including any expert witness fees; and

8. grant Plaintiffs such other further relief as the Court may deem just and proper.

Respectfully submitted,

/s/Eric R. Glitzenstein
Eric R. Glitzenstein (D.C. Bar No. 358287)

Meyer Glitzenstein & Eubanks LLC
4115 Wisconsin Ave., N.W., Suite 210
Washington, DC 200016
(202) 588-5206
eglitzenstein@meyerglitz.com

/s/William F. Sheehan

William F. Sheehan (D.C. Bar No. 174714)
Law Office of William F. Sheehan
P.O. Box 362
Barnesville, MD 20838
(301) 922-8618
wsheehan123@gmail.com

/s/William S. Eubanks II
William S. Eubanks II (D.C. Bar No. 987036)

Meyer Glitzenstein & Eubanks LLP
2601 S. Lemay Ave., # 7-240
Fort Collins, CO 80525
(970) 703-6060
beubanks@meyerglitz.com

*Counsel for Plaintiffs*